James FARMER, Eugene T. Reed, Rev. Gardner Taylor and Rev. Robert J. Stone on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Robert MOSES, President of New York World's Fair 1964–1965 Corporation, and New York World's Fair 1964–1965 Corporation, a New York Corporation, Defendants.

United States District Court
S. D. New York.
June 30, 1964.

Howard M. Squadron, Carl Rachlin, Jack Greenberg, Constance Baker Motley, Michael Meltsner, and Lois Waldman, New York City, for plaintiffs.

Whitman, Ransom & Coulson, New York City, for defendants, Charles F. Preusse, John V. Thornton, Bernard L. Sanoff, and Pincus M. Berkson, New York City, of counsel.

TYLER, District Judge.

Plaintiffs have sued to enjoin the New York World's Fair 1964–1965 Corporation (hereinafter "the Fair Corporation") from preventing them from picketing and disseminating handbills in a peaceful and orderly manner inside the Fair grounds before certain specified pavilions or exhibits. More particularly, the present application seeks a temporary mandatory injunction to compel the Fair Corporation to grant plaintiffs the right to picket and pass out handbills. Jurisdiction is stated to rest upon the provisions of 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.

Plaintiffs assert that on May 20, 1964 a lawyer of the NAACP Legal Defense and Educational Fund, Inc. acting on their behalf sent a telegram to Mr. Robert Moses, President of the Fair, requesting permission, upon payment of regular admission prices, to picket peacefully in "public areas in front of or near the Florida and Louisiana Pavilions", and further requested "permission for a reasonable number of persons to distribute handbills relative to racial discrimination on May 28, 1964 at the fair" in the areas aforementioned. The telegram also asked the favor of a prompt reply. It is conceded that the Fair Corporation never replied to this telegram request.

Plaintiffs therefore contend that their suit is one in equity specifically authorized by statute to restrain a claimed deprivation, under color of state law, of their rights, privileges and immunities secured by the First and Fourteenth Amendments to the Constitution. Essentially, they claim that, under the facts and circumstances here involved, the Fair Corporation is prohibiting them and others similarly situated from picketing peacefully and passing out handbills before designated pavilions within the Fair grounds and that this prohibition amounts to action of a state instrumentality acting under color of state law. More particularly, plaintiffs argue that they have a constitutional right to do these acts within the enclosed confines of the Fair grounds, particularly inasmuch as there has been sufficient state involvement in and impact upon the World's Fair organization, operation and site so as to establish the roads and walkways within the Fair grounds as public thoroughfares.

It is argued for the Fair Corporation that there is no such state action or control as to permit this court to take jurisdiction and that, secondly, and in any event, there has been no denial of a substantial constitutional right of the plaintiffs. Moreover, it is urged that picketing, even if reasonably peaceful, within the crowded confines of the Fair grounds would be inherently dangerous; that paying patrons have a right to be protected against picketing of any kind under circumstances where they are paying for amusement, education and culture; and that to permit these plaintiffs to picket would, of necessity, open the Fair gates to many and diverse groups desiring to picket, all of which would create such formidable obstacles to operation and enjoyment of the Fair as to be legally and factually impracticable.

█ The first question to be answered is whether there is sufficient "state action" or control as to confer upon this court jurisdiction of this controversy. As plaintiffs and defendants are well aware, neither the aforementioned statutes nor the Fourteenth Amendment are aimed at essentially private conduct.

There appears to be no substantial dispute about the following facts:

By Chapter 429 of the Laws of New York of 1960, a New York State Commission on the World's Fair was established to prepare for the State's active participation in the 1964–1965 Fair. In 1962, the legislature further provided that this Commission be empowered to perform such acts as would be necessary and appropriate to insure that "the maximum number of visitors will be attracted to the state's exhibits and the entire state during the fair period". (L.1962, Ch. 818).

Previously, on August 18, 1959, the Fair Corporation had been organized and chartered as a membership corporation under the laws of the State of New York. Its charter states, among other things, that the 1964–1965 World's Fair is to be held and operated for "exclusively educational purposes".

On May 27, 1960, the City of New York entered into a lease agreement with the Fair Corporation. By its terms, the City leased to the Fair Corporation real property which actually is part of Flushing Meadow Park, a City facility. Thereafter, on June 10, 1960, the agreement of lease was approved by the Board of Estimate of the City of New York. Under the terms of its lease agreement with the City, the Fair Corporation does not pay any specified rental. It is obliged to pay over to the City, however, all net revenues remaining to its credit after the close of the Fair. At this time, it is estimated that all of such net revenue will probably amount to around fifty million dollars. Moreover, the Fair Corporation is obliged under the terms of its lease to turn over to the City, at the end of the Fair in 1965, all buildings, structures, pavements and other facilities useful for park purposes as certified by the Commissioner of Parks of the City of New York.

The Fair Corporation has raised its capital and operating funds through the sale of promissory notes and by means of bank loans; in addition, it has raised monies through rental of space to exhibitors, concessionaires and others. It also has raised funds through advanced ticket sales. These monies have been used for the construction of the Fair grounds and for current operations. The City of New York has expended twenty-four million dollars in the area; this money was appropriated by the City in accordance with usual capital budget procedures to pay for permanent improvements in Flushing Meadow Park, which, of course, is the site of the Fair.

Approximately seven hundred million dollars have been invested in the Fair, including all building and exhibit costs and operating expenses. The governments of the United States, the State of New York, the City of New York and a number of other states have participated in this investment for construction and operation of their own exhibits and, in the case of the City of New York, for the permanent park improvements re-

ferred to hereinabove. None of these governmental funds have been appropriated, however, for use by the Fair Corporation.

The United States, the State of New York and the City of New York have granted to the Fair Corporation tax exemptions respecting property, receipts, sales, fees and other income.

The arterial highways in the vicinity of the Fair site were concededly constructed on an accelerated basis in view of the fact that the Fair was being held this year and next. Obviously, both the State of New York and the federal government have expended funds and otherwise participated in the development and construction of these highways. No funds from governmental sources for these highways have been contributed to or paid over to the Fair Corporation, and it appears beyond controversy that the highways were constructed in accordance with the usual federal and state statutory authorizations.

The Fair Corporation has entered into contractual arrangements with the Pinkerton Agency whereby the latter agency supplies a force of approximately 1,000 men to handle policing and security arrangements in and at the Fair grounds. Section 1 of Chapter 892 of the Laws of the State of New York of 1963 provides that members of the private police force at the Fair site are to be deemed "peace officers" within the meaning of that term as used in state statutes.

Section 3 of Chapter 892 of the New York Laws of 1963, as amended by Chapter 580 of the Laws of 1964, purports to define the status of certain streets, roads, sidewalks and walkways within the Fair site under the jurisdiction of the Fair Corporation. It reads as follows:

"A violation of any provision of law relating to safety, regulation of traffic or the preservation of order occurring at or on the streets, roads, highways, sidewalks, walkways, parking fields, parking areas, parking facilities or bus terminals of the property under the jurisdiction of New York World's Fair 1964–1965 Corporation shall be deemed to have occurred on a public street, road, highway, sidewalk, walkway, parking field, parking area, parking facility or bus terminal and not on private property, and such parking fields, parking areas, parking facilities and bus terminals shall be deemed streets, roads or highways. This act shall not, however, affect the private property status of such streets, roads, highways, sidewalks, walkways, parking fields, parking areas, parking facilities or bus terminals for the purposes of subdivision fourteen of section sixty-one of the public service law, or for the purposes of any law, act or ordinance relating to taxation or licensing or for regulatory or any other purposes; nor shall this act or any other law, act or ordinance be deemed to require the registration of such vehicles as may be authorized by the New York World's Fair 1964–1965 Corporation for use, operation or display within the property under the jurisdiction of said corporation which vehicles are used, operated or displayed solely thereat, or to require the licensing of the owners, chauffeurs, operators or drivers of such vehicles."

Prior to the opening in April of this year, the Fair Corporation adopted a regulation concerning picketing, demonstrations, etc., which regulation at least theoretically is still in effect and provides:

"Demonstrations, parades, congregations, picketing or other similar acts on the Fair site are prohibited except under written permit of New York World's Fair 1964–1965 Corporation. No person may enter the Fair site with sticks, placards, handbills or other materials for use in an unauthorized demonstration. Any person violating this regulation is a trespasser, subpect to ejection from the Fair, arrest and prosecution."

It has been stated by its officials in this proceeding that the Fair Corporation has adopted the policy of not permitting picketing of any kind by any person or group within the Fair site. Neither in their papers nor upon oral argument have defendants attempted to explain how and why the subject of picketing was specifically included in their regulation in the first place.

There is no evidence, nor do plaintiffs argue, that the Fair Corporation or any of its agents has been guilty of any discrimination against plaintiffs or others similarly situated in its operating practices such as employment, admissions and the like. Nor is there any indication in this record that the operators of the Florida and Louisiana pavilions have practiced any discrimination against members of the public.[1]

As is now widely known, the Fair Corporation charges general admission fees of $2.00 per adult and $1.00 per child. It is presently estimated that there will be 70,000,000 total paid admissions to the Fair in 1964 and 1965. This is an average of about 200,000 persons per day when one takes into account that the Fair will be open a little less than six months in each of the two years. To date, the highest daily attendance has been 300,000 persons, but there is reason to expect that there may be days when as many as 500,000 persons will be at the Fair site.

Since the Fair grounds consist of 646 acres of land, the crowd density on an average day of 200,000 paid admissions is not inconsiderable, especially when there is factored "in" some 30,000 workers on the scene and when there is factored "out" a substantial number of acres devoted to parking lots, landscaping, sculpture and other structures in or on which people cannot congregate.

Upon analysis of the foregoing facts, I find that the Fair Corporation and its operations are so impregnated with and supported by state and city action as to place them within the ambit of the Fourteenth Amendment. This is so even though it may be reasonably inferred that the Fair Corporation does possess certain indicia and aspects of "private" ownership and dominion.

As the majority opinion pointed out in Marsh v. Alabama, 326 U.S. 501, at 506, 66 S.Ct. 276, at 278, 90 L.Ed. 265 (1946), "(o)wnership (of property) does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it". Upon the uncontested facts here, it would be sophistry to argue or conclude that the Fair is a completely private venture, even though it is operated by a private corporation. As a high state court has already stated, " * * * the New York World's Fair, although operated by a private corporation, is a matter of public concern, for the public good, and for the general welfare of the State". Froslid v. Hults, 20 A.D.2d 498, 248 N.Y.S.2d 676, at 679 (App.Div., 2d Dept.1964).

The Fair purposes, as indicated heretofore, are explicitly set out in its certificate of incorporation. They are "to organize, construct, hold and operate a world's fair in the City of New York for the exclusively educational purposes of educating the peoples of the world as to the interdependence of nations and the need for universal peace". Educating the populace is a proper function of the state, and where the state creates separate instrumentalities to carry on its work, the latter may become subject

1. The record is also silent as to the direct involvement, if any, of the States of Florida and Louisiana in the pavilions in question. Since the argument of this motion, various newspapers in New York City have reported that the State of Louisiana has withdrawn from the operation of the pavilion bearing its name. This court, however, makes no finding to this effect or with regard to this particular subject.

to the constitutional restraints imposed upon the state itself. See Kerr v. Enoch Pratt Free Library of Baltimore City, 149 F.2d 212 (4th Cir.), cert. den. 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427 (1945). "The test is not whether the * * * [defendants] are the representatives of the state in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action". Nixon v. Condon, 286 U.S. 73, 89, 52 S.Ct. 484, 487, 76 L.Ed. 984 (1932); Anderson v. Moses, 185 F.Supp. 727, 733 (S.D.N.Y., 1960).

█ The federal courts have recognized that when a city or state leases public property in such a manner and for such purposes wherein services of a kind that the city or state could render or has rendered are actually performed by a "private" lessee, the latter stands in the shoes of the government entity, Hampton v. City of Jacksonville, 304 F.2d 320 (5th Cir. 1962), cert. den. sub nom. Ghioto v. Hampton, 371 U.S. 911, 83 S.Ct. 256, 9 L.Ed.2d 170 (1962); Derrington v. Plummer, 240 F.2d 922 (5th Cir.), cert. den. sub nom. Casey v. Plummer, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957), and such lessee must comply with the proscriptions of the Fourteenth Amendment. Burton v. Wilmington Parking Authority et al., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

█ Furthermore, the courts have found state action to exist even in cases where there has been a sale, rather than a lease, of public property. See Hampton v. City of Jacksonville, supra; Smith v. Holiday Inns of America, Inc., 220 F.Supp. 1 (M.D.Tenn.1963). Indeed, the crucial test of state action is said to be "the actuality of state involvement rather than the form of the transaction". Smith v. Holiday Inns, supra, at p. 8.

Similarly, mere acceptance of significant governmental appropriations has been held sufficient to render a "private" recipient subject to the restrictions of the Fourteenth Amendment. Simkins v. The Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963).

Plaintiffs here ascribe much importance to the fact that the state legislature has deemed the police force provided by the Fair Corporation to be "peace officers" of the state. "When given police powers, individual citizens become state agents without question * * *." Baldwin v. Morgan, 251 F.2d 780, 790 (5th Cir. 1958). See also, Williams v. United States, 341 U.S. 97, 71 S. Ct. 576, 95 L.Ed. 774 (1951). The reason is that a private person or entity " ' * * * takes its character as a state agency from the duties imposed upon it by state statutes * * *.' " Ibid.

In addition, Section 4 of Chapter 892 of the New York Laws of 1963 raises the status of regulations promulgated by the Fair Corporation to that of municipal ordinances. It provides as follows:

"New York World's Fair 1964–1965 Corporation may prepare a special code or codes of law dealing with prohibited acts, protection of life and property, regulation of traffic, fire prevention, regulation of parking, preservation of the peace and the arrest of offenders or [sic] any of the above. Such special code or codes shall be submitted to the council of the city of New York for its approval, and if such code or codes are approved by such council, then such council may enact the same as and for a special code or codes of laws governing the area leased to New York World's Fair 1964–1965 Corporation and such special codes shall be administered and enforced by New York World's Fair 1964–1965 Corporation and the police force provided by it. Such special codes shall have the force and effect of local laws of such city and all provisions of the New York city

charter, the administrative code of such city and all acts of the legislature and all local laws which may conflict with any provision of such special code or codes shall be and they hereby are suspended insofar as the area under the jurisdiction of New York World's Fair 1964–1965 Corporation is concerned during the term of the lease of such area to New York World's Fair 1964–1965 Corporation. Any violation of such special code or codes so adopted shall be a misdemeanor unless otherwise provided therein and all fines and penalties collected thereunder shall be the property of the City of New York. Such special code or codes may be amended from time to time in the same manner as provided for their enactment."

Thus, not only are the Fair officers "Peace officers" of the state, but also they purport to act as such by virtue of the authority of municipal law. This is undoubtedly acting under "codes of law," Valle v. Stengel, 176 F.2d 697 (3d Cir. 1949), and may be sufficient unto itself to vest this court with jurisdiction. It is of some significance that the Fair regulation concerning picketing, among others, is given the effect of local law to such an extent that the state and local courts are given jurisdiction to try persons charged, for example, with trespass or breach of the peace and mete out punishment to them in the name of the state.

■ It seems inescapable, therefore, that the State and City of New York, with all propriety and by specific executive and legislative fiat, have significantly contributed, and continue so to do, to the control and operation of the 1964–1965 World's Fair. If this be so, it follows that, at least for certain purposes, the Fair is a public or quasi-public venture and, that its officers and agents cannot ignore the constitutional rights of those members of the public who use and enjoy the Fair facilities.[2]

This conclusion, without more, does not lead to easy answers to the merits of the issues posed by this motion. As even plaintiffs must concede, there do not appear to be any reported cases which, upon squarely analogous facts, support the plaintiffs' position in full.

For reasons to be discussed briefly hereinafter, I determine that plaintiffs are not entitled to an order permitting them to picket at the desired locations within the Fair site but that an appropriate order should issue to permit dissemination of handbills at designated stations within the Fair gates.

■ Taking up first the claimed right to picket before the Louisiana and Florida Pavilions, the Supreme Court has consistently recognized that a state has the right to refuse or prevent picketing under certain circumstances. See Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); International Brotherhood of Teamsters, etc., Union v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995 (1950); Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Plaintiffs apparently do not quarrel with this proposition as such, but they do urge that the Fair Corporation's rejection of their request to picket falls at least generally within the scope of such discriminatory "state action" cases as Burton v. Wilmington, supra, and such "free speech" cases as Marsh v. Alabama, supra.

The important question here is whether under all the surrounding circumstances the regulation controlling the use of the Fair's streets, so far as picketing is concerned, "den[ies] or unwarrantedly abridge[s] the right of assembly and

2. In so saying, this court is aware of a decision of the Criminal Court of the City of New York, Queens County, People v. Collins et al., decided June 11, 1964, wherein it was held, *inter alia,* that the Fair grounds are private property. Assuming that I have correctly interpreted the holding to this extent, I cannot entirely agree with it.

the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).

The Supreme Court, wisely enough, has never expounded rules of general application in this area. On the contrary, that court has recognized that "the specific situations" are controlling. Hughes v. Superior Court, 339 U.S. 460, 465, 70 S.Ct. 718, 94 L.Ed. 985 (1950). As I understand the cases, the most that has been said of general application is that picketing is a "hybrid" right which "cannot dogmatically be equated with the constitutionally protected freedom of speech." International Brotherhood of Teamsters, etc., Union v. Hanke, 339 U.S. 470, 474, 70 S.Ct. 773, 775, 94 L.Ed. 995 (1950). See, also, Hughes v. Superior Court, supra.

Upon careful appraisal of the nature of the Fair operation and all the other circumstances indicated by the record before me, I conclude that plaintiffs have not established that they are entitled to a temporary injunction allowing them to picket before or near the places desired within the Fair grounds. The conclusion might be otherwise were plaintiffs complaining of discrimination or other deprivations of their rights by the City or State of New York or by the Fair Corporation itself. But, concededly, they are not. It might also be otherwise if the streets and walkways of the Fair were open and accessible and without such barriers as fences, gates and ticket windows. But, clearly, the Fair grounds differ in significant respects from the usual streets and thoroughfares of a city or town, even including a "company" or privately owned town.

Moreover, informational picketing of the type understandably sought here is not clearly a desirable method for plaintiffs to use when weighed against such factors as the crowds in attendance, the relatively restricted areas and spaces, the convenience and enjoyment of visitors who pay admission and the like. A picket line usually produces more coercive influences, takes up more room and creates more need for security measures in a crowded area than does, for example, a speaker or a handbill distributor; these considerations can be said to apply with especial practical impact in an area such as the Fair grounds. The discrimination cases cited by plaintiffs do not vitiate or exclude such considerations here; the obvious proposition that access to Fair facilities cannot be discriminatively denied may not be transposed without more into specific authority for all who enter the Fair to picket when and where they choose.

It does not follow, however, that plaintiffs may not engage in a reasonable method of disseminating handbills from stations on the public walkways near the two pavilions in question. In considering a case involving the right to picket, the Supreme Court has recognized that, "Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line." Hughes v. Superior Court, 339 U. S. 460, 465, 70 S.Ct. 718, 721, 94 L.Ed. 985 (1950). As discussed hereinabove, the right to distribute handbills normally has been given a higher position in the hierarchy of constitutionally protected activities than has the right to picket. Both methods are designed to convey information. The state is given greater latitude, however, in controlling the right to picket since "the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication." Ibid. In the absence of a claim of discrimination by the State, the City or the Fair Corporation, there is no overriding reason why plaintiffs should have the right to "exert influences" and "produce consequences" which are the normal effects of a picket line. Conversely, there is no compelling reason why they should not have the right to quietly and peacefully

disseminate informational literature or handbills, a right more jealously preserved and protected by the Constitution. Contrary to defendants' arguments, those of us who pay the regular admission fee and attend the Fair cannot be totally insulated from our fellows, nor can we expect to be shielded from expressions or ideas which are unanticipated and unsolicited. An individual's right of privacy is of practical necessity limited by the rights of others when he leaves his home and ventures forth into public areas, even those which he must pay to enter. See Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952).

Defendants voice the fear that granting plaintiffs relief will convert the Fair grounds into an ideological battlefield. The short answer to this argument is that this court necessarily is limited to consideration of plaintiffs' application and none other; moreover, nothing contained in this opinion should be construed to confer an automatic license upon all others who may yearn to pass out handbills within the Fair grounds. On the other side of the coin, the remarks of this court cannot be interpreted to preclude picketing by other groups under other circumstances.

Finally, what has been implied heretofore must be expressed with regard to the Fair Corporation's regulation purporting to cover picketing, demonstrations and similar activity. As drafted and as construed by the defendants in this instance, it is arbitrary and vague and, as such, an unconstitutional burden on the enjoyment of free speech. Reasonable standards can be promulgated so that those who administer the regulation may not have totally unfettered discretion to determine whether to grant or withhold permission to picket and speak and disseminate informational literature. This is not to say, however, that defendants have to permit all kinds of demonstrations, picketing and the like, nor is it suggested that reasonable restrictions as to time, numbers, places or extra fees to cover extra services, for example, cannot be considered and implemented.

Settle order in conformity with the foregoing matters.