Ronald G. WOLIN, Individually and on Behalf of Veterans and Reservists to end the War in Vietnam and the Fifth Avenue Vietnam Peace Parade Committee, Plaintiff,

v.

PORT OF NEW YORK AUTHORITY, Albert Rubbert, Manager of the Port Authority Bus Terminal, Captain Robert Friend, Commanding Officer of Port Authority Terminal Police, Lieutenant James Pettis, Lieutenant Fred Rackowski, Lieutenant Hugo Serrati, Lieutenant Anthony Unetich and Lieutenant George Gaulrapp, Officers of the Port Authority Terminal Police, Defendants.

No. 66 Civ. 4396.

United States District Court
S. D. New York.
May 3, 1967.

Eugene G. Eisner, Bradley R. Brewer and Henry M. Di Suvero, New York City, for plaintiff.

Sidney Goldstein, New York City, for defendants.

MANSFIELD, District Judge.

Plaintiff, who sues individually and on behalf of two organizations which are opposed to United States policy in Vietnam,[1] seeks a declaratory judgment that he be permitted to distribute political leaflets in the main concourse and other passageways of the Terminal Building ("Terminal" herein) operated by the Port of New York Authority ("Port Authority" herein) at Eighth Avenue and 40th Street, Manhattan, and used by the public; and that the defendants be enjoined from restraining such activities, arresting him, requiring him to obtain permission to engage in such activities, or discouraging the public by various means from accepting such leaflets.[2] Jurisdiction is based on 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343 and 2201 and the First and Fourteenth Amendments to the United States Constitution. The parties have cross-moved for summary judgment pursuant to Rule 56, F.R.Civ.P.

Defendant Port Authority is a public corporation created in 1921 pursuant to a compact between New York and New Jersey. McKinney's Unconsolidated Laws of N.Y. § 6401, § 6404. Its business is conducted by twelve commissioners, six of whom are appointed by the State of New York and six of whom are appointed by the State of New Jersey. Ibid. § 6405. The Port Authority, among other things, operates the Terminal which occupies one full city block between Eighth and Ninth Avenues and 40th and 41st Streets in Manhattan. The Terminal contains a number of areas open to the public, including a main concourse approximately 50 feet wide, an upstairs and a downstairs concourse, a major subway entrance and various subways and walkways. In addition, within the Terminal there are bus line ticket counters, newsstands, restaurants, snack bars, a bakery, a drugstore, a bar, a bowling alley, a bank, gift shops and various other shops and concessions which are open to the general public. Thousands of people use the Terminal facilities on each day. For example, the average number of persons passing through the Terminal daily in 1966 was 205,000 and on December 24, 1966, ap-

---

1. The organizations are the Fifth Avenue Vietnam Peace Parade Committee and the Veterans and Reservists to End the War in Vietnam.

2. Defendants are the Port Authority, its Manager, the Commanding Officer and various other officers of the Port Authority Terminal Police.

proximately 325,000 persons used the Terminal. During 1965 over 68,000,000 persons used the Terminal. It may well be the busiest terminal in the world.

The Port Authority maintains a police force for the purpose of maintaining order in the Terminal and enforcing Port Authority rules and regulations. The force consists of a substantial number of officers serving under the supervision of the Manager of the Terminal, defendant Albert Rubbert. The Manager has instructed members of the Port Authority's police force to arrest any persons who attempt to distribute leaflets in the Terminal when they have been denied permission by the Terminal to do so and have been given an opportunity to leave the Terminal.

At various times during the months of October, November and December, 1966, principally on Sunday evenings, plaintiff and those associated with him have distributed outside the 8th Avenue entrance to the Terminal leaflets criticizing our Government's participation in the Vietnam war. Plaintiff's activities, which have consisted of handing out literature to persons on the sidewalks outside the Terminal and occasionally engaging in conversation with someone who stops to take a leaflet, have at all times been conducted in a peaceful and orderly manner, although they have on occasions led others to call out criticisms, attempt to persuade pedestrians not to accept the leaflets, and on four occasions assaults have been made upon plaintiff or one of his associates.

On the evening of November 6, 1966, plaintiff and five other persons entered the Terminal and distributed political leaflets in a peaceful and orderly manner in the hallway and waiting area near gates 106–115 on the upper bus level for approximately 80 minutes. Despite the fact that they in no way interfered with the movement of traffic in the Terminal, they were forced to leave by Port Authority Police who threatened their ar-

rest. On November 13 and 20 there were similar occurrences.[3]

By letter dated November 16, 1966, plaintiff, on his own behalf and on behalf of the organizations represented by him and their friends and supporters, requested permission of the Manager of the terminal to distribute political handbills or leaflets relating to our Government's policy with respect to the Vietnam war, to carry placards containing political messages or slogans pertaining thereto, to set up folding card tables for distribution of such political literature, and to engage in discussions with pedestrians who might stop to converse with them. Plaintiff advised that his purpose was to communicate views concerning our Government's participation in the Vietnam war to travelling servicemen and members of the public within the Terminal, that plaintiff and the groups represented by him did not intend to interfere in any significant or substantial way with the operation or use of the Terminal for the convenience of bus passengers or other persons using the building, and that plaintiff desired to engage in such activities inside the Terminal rather than be relegated to the sidewalk perimeters for the reason that plaintiff's communication of his group's messages to pedestrians waiting inside the Terminal would be more effective than attempts to communicate views to persons using the sidewalks to enter or leave the Terminal, since passengers waiting inside the Terminal concourse had more time and hence were more receptive than those hurrying across the sidewalk to or from the Terminal. Plaintiff further advised that if a group of bystanders, in response to plaintiff's dissemination of such information, should create any interference with traffic, plaintiff and his group would call upon their members to disperse, and plaintiff would temporarily cease activities until such a situation no longer existed, so that his activities would not obstruct the passage of anyone in the Terminal or inter-

---

3. The parties have stipulated that on November 13 no "incidents" occurred and there was no interference with the free flow of traffic in the Terminal. There is no evidence as to whether there was such interference on November 20.

fere with the operation of any business or concession therein.

On November 17, 1966, defendant Albert Rubbert, Manager of the Terminal, responded that plaintiff's request was denied pursuant to the Port Authority's standing policy of refusing to permit anyone to engage in picketing, demonstrations and leaflet distribution. He further advised that if, notwithstanding such refusal, plaintiff attempted to engage in such activities, he would request the Port Authority police to arrest them after a reasonable opportunity was given to cease such activity.

It has been stipulated between the parties that the Port Authority and the defendant Rubbert have in the past granted permission to various charities to solicit contributions in the Terminal, that they have permitted glee clubs to sing Christmas carols in the Terminal, which were broadcast over the loud speaker system, and that they have, for a fee, permitted automobile manufacturers to place automobiles and advertising material on display in the Terminal.

A threshold question is whether the Port Authority Terminal is a public or quasi-public place. If it were private property, used for the owner's private purposes, the plaintiff's Constitutional right to disseminate ideas and communicate beliefs and views would be required to yield to the owner's right to be protected against trespass or invasion of his Constitutional right of privacy. Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Watchtower Bible & Tract Society v. Metropolitan Life Insurance Co., 297 N.Y. 339, 79 N.E.2d 433, 3 A.L.R.2d 1423, cert. denied, 335 U.S. 886, 69 S.Ct. 232, 93 L. Ed. 425 (1948). If, on the other hand, the Terminal is property essentially dedicated to public use, the citizen's fundamental right freely to express his views in a public place must be recognized and this right may be curbed only to the extent that reasonable, non-discriminatory regulation is essential to prevent crippling the primary public use to which the property is dedicated. As the Supreme

Court stated in Marsh v. State of Alabama:

"Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.

&ast; &ast; &ast; &ast; &ast; &ast;

"When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, * * * we remain mindful of the fact that the latter occupy a preferred position." (326 U.S. 501, 506, 509, 66 S.Ct. 276, 278, 280, 90 L.Ed. 265 (1946))

The citizen's Constitutional right under the First and Fourteenth Amendments to communicate ideas and views to his fellow citizens, however unpopular such views may be, represents one of the bulwarks of our free, democratic society. Traditionally our public streets, meeting halls, parks and similar places have been recognized as locations in which this sacred right may be exercised, not only because such places, being dedicated to public use, are held in trust for all citizens, but also because they are usually locations where the ears of large numbers of fellow citizens can most effectively be reached. Such public sites are the "natural and proper places for the dissemination of information and opinion" Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Hague v. CIO, 307 U.S. 496, 515, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for

communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied." (From opinion of Mr. Justice Roberts in Hague v. CIO, 307 U.S. 496, 515–516, 59 S.Ct. 954, 964, which was later adopted as the opinion of the Supreme Court.)

■■ In determining whether a particular location, such as the Terminal in the present case, is a public one, we look to substance rather than to form. The fact that title to the site may be held in the name of a separate corporation or entity is not controlling, if in fact its purpose and use are public in nature. Marsh v. State of Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L.Ed. 265 (1946); Farmer v. Moses, 232 F.Supp. 154 (S.D.N.Y.1964). Dedication of property to public use in effect dedicates it to the exercise by the public of Constitutional rights, including the rights of free speech and assembly under the First Amendment.

■ Applying these fundamental principles here, there can be no serious question about the fact that the Terminal is essentially a public establishment, dedicated to public use. It is a creature of the States of New York and New Jersey. It exists and operates under their direction and control, being an agent of both states, McKinney's Unconsolidated Laws § 6451; Port of New York Authority v. J. E. Linde Paper Co., 205 Misc. 110, 127 N.Y.S.2d 155 (1953); Port of New York Authority v. City of Newark, 17 N.J. Super. 328, 85 A.2d 815 (1952). Its powers emanate from an agreement between the two states. Its Terminal is designated by statute as being "in all respects for the benefit of the people of the states of New York * * *." and the Port Authority is described as performing an essential "governmental function in undertaking the construction, maintenance and operation thereof and in carrying out the provisions of law relating thereto", McKinney's Unconsolidated Laws § 6703.[4] Its securities are tax exempt, Ibid. § 6459. It has the power of subpoena (Ibid. § 6463) and its police force are expressly provided with all the powers of "peace officers" (N.Y.Code of Crim.Proc. § 154). Although it is true, as defendants note, that a "bus terminal" under New York law (Ibid. § 6701) exists

> " * * * for the accommodation of omnibuses and other motor vehicles operated by carriers engaged in the transportation of passengers, or for the loading, unloading, interchange or transfer of such passengers or their baggage, or otherwise for the accommodation, use or convenience of such passengers or such carriers or their employees * * *."

the operation of the Terminal requires the Port Authority, as a practical matter, to permit the general public to have free access to the concourse, waiting rooms, and shops and services located in the Terminal building. It has not been suggested that non-passengers are excluded from the Terminal. On the contrary, it appears that certain portions of the Terminal (such as the concourse) may be used by members of the public for the purpose of patronizing shops or other services located in the Terminal building, and that friends of passengers may freely use the waiting room facilities. No fee

4. "§ 6703. *Benefits from terminal; construction as governmental function*
"The establishment, maintenance and operation of such motor bus terminal within the port of New York district is and will be in all respects for the benefit of the people of the states of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions; and the port authority shall be regarded as performing an essential governmental function in undertaking the construction, maintenance and operation thereof and in carrying out the provisions of law relating thereto."

is exacted as a condition to entry into the Terminal, a factor considered relevant by the Court in holding that the concourse or well of the Pennsylvania Railroad Station in New York City was a public place in which picketing might be conducted. People v. Barisi, 193 Misc. 934, 86 N.Y.S.2d 277 (Magistrate's Ct. 1948). Unlike the jail grounds in Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), which the Supreme Court found *not* to be open to the public, since the jail was "built for security purposes", the Terminal here is open to the public and is at least as "public" a place as the "company-owned" town in Marsh v. State of Alabama, supra, and as the grounds of the New York World's Fair, which Judge Tyler of this Court found to be a location where the public was entitled to distribute leaflets, even though a fee was charged for admission to the fair grounds. Farmer v. Moses, 232 F.Supp. 154 (S.D.N.Y.1964).[5] In effect the concourses of the Terminal, like the streets of New York, function as a thoroughfare through which an average of over 200,000 pedestrians pass daily for the purpose of getting to and from their places of business, homes, shops, and other locations.

Defendants rely upon § 150 of New York's Penal Law, McKinney's Consol. Laws, c. 40 as evidencing an intent that as far as persons in the position of the plaintiff are concerned a bus terminal is to be considered private property.[6] Their reliance, however, is misplaced. As New York's Court of Appeals noted in People v. Bell, 306 N.Y. 110, 115 N.E.2d 821 (1953), in construing identical language in § 1990–a of the Penal Law, the

purpose of such disorderly conduct statutes is to prevent terminals from being infested by those "who have no occasion to be there", such as congregations of degenerates or nondescript characters who pose a danger to the public. In the interest of public welfare and safety, the law prohibits a bus terminal from being turned into a public housing development for reprobates who might rush like lemmings to its shelter and thus congest and disrupt its essential operations. No such threat is posed here. Furthermore, as the Court noted in *Bell*, there are many purposes other than travel for which a citizen may lawfully be present in a terminal (e. g., patronizing shops, bowling alleys, or using toilet facilities) so that the legitimacy of a person's presence in a terminal must be "decided as the case arises". Recognizing the reluctance of New York's highest court to affirm convictions in the absence of proof of more than mere unexplained presence in a terminal (See Bell, and People v. Dreares, 15 A.D.2d 204, 221 N.Y.S.2d 819 (1st Dept. 1961), affd. without opinion, 11 N.Y.2d 906, 228 N.Y.S.2d 467, 182 N.E.2d 12 (1962)), we do not view § 150 of the Penal Law as casting doubt on our conclusion that the Terminal concourses are essentially public thoroughfares which may be used by persons like the plaintiff here who do not fall within the category of miscreants intended to be barred.

The fact that the concourses of the Terminal are public does not have the effect of granting a license to the plaintiff or other citizens to engage in unbridled or uncontrolled activities in the name of Constitutional freedom. It must

---

**5.** See also Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union Local No. 231, 61 Cal.2d 766, 40 Cal.Rptr. 233, 394 P.2d 921 (1964), cert. denied, 380 U.S. 906, 85 S.Ct. 888, 13 L.Ed.2d 794 (1965) (shopping center parking lot); People v. Ribinovich, 171 Misc. 569, 13 N.Y.S.2d 135 (Spec. Sessions, 2d Dept. 1939) (Coney Island boardwalk).

**6.** "*§ 150. Peddling, unauthorized soliciting of business or trade, begging or*

*loitering on air and bus terminal property.*

\* \* \* \* \*

"2. Any person who loiters about any toilet, area, station, station platform, waiting room or any other appurtenance of an air or bus terminal, or who is found sleeping therein or thereon and who is unable to give satisfactory explanation of his presence is guilty of an offense."

be remembered that the primary purpose and principal function of the Terminal is to provide transportation facilities for the more than 200,000 people who use it daily. The public is entitled to such service free from any substantial obstruction and toward that end the Port Authority may exercise its governmental responsibility to insure the free flow of traffic through the Terminal, unimpeded and unhampered to any substantial degree by distribution of leaflets, picketing, or similar conduct. As the Supreme Court recently pointed out in Cox v. State of Louisiana, 379 U.S. 536, at 554–555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965):

> "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

In the exercise of its responsibility to insure the flow of traffic through the Terminal, free from any undue obstruction, the Port Authority may promulgate reasonable, uniform and nondiscriminatory regulations of general application that are calculated to achieve that objective. McKinney's Unconsolidated Laws § 6419. In the absence of proof that the proposed activities here, however, would obstruct or hamper the Terminal for transportation purposes, the Port Authority may not ban such activities altogether. In balancing the citizen's Constitutional right to communicate ideas and views against the police responsibility to maintain a free flow of traffic, the exercise of Constitutional rights will be favored unless it is shown that prohibition is essential under the circumstances to insure operation of the Terminal for its primary purpose.

It does not appear to be contended by the defendants that every leaflet distribution would automatically obstruct traffic regardless of the time, frequency, and number of leafleters involved. On the contrary, they have stipulated that on at least two occasions plaintiff's leafleting within the Terminal was peaceful and did not interfere in any way with the movement of pedestrian traffic. Thus the present case is clearly distinguishable from those where the challenged conduct, usually picketing in a labor dispute, has been found to obstruct or impede the flow of traffic, e. g., Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Nelson v. Chicago, CCH Aviation Service ¶17,878 (N.D.Ill.1965).

Notwithstanding the relatively peaceful nature of plaintiff's activities to date, and the absence of any adverse effect on the operations of the Terminal, defendants argue that the controversial nature of the subject matter of plaintiff's leaflets (protests against our Government's involvement in Vietnam) will lead to violence or rioting, particularly since the Terminal is heavily frequented by members of the Armed Services. Recent

anti-Vietnam "marches", "parades", and similar activities in New York City, lend some support to defendants' apprehensions. On the other hand, plaintiff has represented to the Court that in such event he and his group would suspend their activities until they could be resumed peacefully; and should plaintiff's activities lead to violence, riots or other obstruction of traffic appropriate relief must be made available. However, it is the very expression of views with respect to controversial political issues that most requires protection under the First and Fourteenth Amendments, however distasteful such views may be to certain segments of our society. The right of free public expression on political issues is too dearly prized to be curtailed without equally important public cause. Such suppression would be the first step toward ultimate stagnation of essential debate. See Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

Other "reasons" submitted by the defendants are equally unimpressive. The fact that the passing out of leaflets might lead to the littering of the Terminal building is unfortunate but certainly is not a sufficient justification for circumscribing a person's Constitutional rights. Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Nor does the fact a person might impart his ideas effectively in another place provide any reason for denying a person's right to manifest his views in a spot of his own choosing. Ibid. The contention that the operation of the Terminal building would be stifled by a flock of leafleters subsequent to a decision adverse to the defendants carries little weight since the Court is dealing only with the rights of the plaintiff and those whom he represents. Farmer v. Moses, supra.

Defendants further contend that they are entitled to bar plaintiff's proposed leafleting activity by virtue of the following rules and regulations promulgated by the Port Authority pursuant to § 6419, McKinney's Unconsolidated Laws:

"2. The Superintendent of the Terminal shall have authority to deny the use of the Terminal to any individual violating Port Authority Rules and Regulations, or laws, ordinances or regulations of * * * the State of New York or the City of New York.

\*　　\*　　\*　　\*　　\*　　\*

"5. No person shall carry on any commercial or other activity at the Terminal without permission.

\*　　\*　　\*　　\*　　\*　　\*

"8. No person shall post, distribute or display signs, advertisements, circulars or printed or written matter within the Terminal without permission." [7]

In practice the Port Authority has delegated to the defendant Rubbert, Manager of the Terminal, the decision as to whether permission will be granted or denied in any particular case, which he exercised to deny plaintiff's written request of November 16, 1966. The effect of these regulations, therefore, is to vest in one individual the awesome power, unrestricted by any objective standards, to grant or deny any application for reasons wholly unconnected with the flow of traffic, and thus to censor the expression of views with which he disagrees. In addition the activities proscribed are so vaguely described as to make it difficult, if not impossible, for the average citizen to guess what might be permitted. For these reasons such regulations are patently unconstitutional. Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Largent v. State of Texas, 318 U.S. 418, 63 S.Ct. 667, 87 L. Ed. 873 (1943); Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State of New Jersey, supra; Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L. Ed. 949 (1938). They threaten the fabric of a free society by permitting unre-

---

7. In addition, without defining what constitutes a "nuisance", Regulation 12 prohibits any person from doing any act or thing which shall result in a creation or maintenance of a "nuisance" at the Terminal.

stricted censorship of causes and views. Already, for instance, the Manager of the Terminal has exercised this power to permit certain charities to solicit funds within the Terminal. Nothing prevents him in his absolute discretion from exercising the same power to permit certain groups to distribute leaflets and to deny that right to others.

For all of the foregoing reasons plaintiff's motion for summary judgment must be granted to the extent that plaintiff and those represented by him may engage in distribution of leaflets within the concourses of the Terminal in a manner that does not substantially or unduly impede either the flow of pedestrian traffic through the Terminal or the furnishing and use of transportation and other services offered by the Terminal. The activities of the plaintiff and of other leafleters may also be subject to such reasonable, uniform, objective and non-discriminatory regulations of general application, with limited discretion vested in appropriate administrative officials, as may be adopted by the Port Authority for the purpose of assuring the flow of traffic. Presumably such regulations, in order to maintain a balance between the different rights and interests involved, would prescribe the number of persons who may engage in such activities at specific times, their duration, the procedure for obtaining permission, the limit on number of permits for a given period, the places within the Terminal where such persons may be stationed, and other similar restrictions of general application. The flow of traffic might even require that during certain peak travel hours any such activities must cease. For instance, photographs submitted by the parties show the concourses to be crowded at certain times and virtually empty at others. The problems faced in adopting reasonable regulations appear to be essentially the same as those resolved by municipal authorities in adopting rules regulating such conduct in public streets, parks and other places.

Pending the adoption by the Port Authority of reasonable, non-discriminatory regulations of general application, the plaintiff and those represented by him will be permitted to engage in distribution of leaflets to the extent heretofore indicated, in accordance with an order fixing terms and conditions more specifically.

Settle order.