OPINION OF THE COURT
Kristin Booth Glen, J.
This case raises important issues which directly affect the ability of tenants to organize effectively in response to conditions which deprive them of safe and habitable accommodations. The right to form and participate meaningfully in tenants’ organizations implicates the First Amendment rights of free speech and association, and involves a State and local statutory scheme which attempts to balance the rights and obligations of landlords and tenants. All of these considerations must figure in a resolution of the issues presented on this motion.
As more fully discussed below, a number of tenants in the Whitby Hotel (the Hotel), a residential and transient hotel located in midtown Manhattan, have formed a ten *795 ants’ association (the Association) which has engaged in rent strikes and other actions over the past several years. The landlord, Whitby Operating Corp. (Whitby) moves here to enjoin the Association from collecting and holding the rent of individual tenants during the present rent strike, and further moves to enjoin the Association and its members[1] from displaying rent strike signs on the windows and doors of their apartments and on the outside of the building appurtenant to their apartments.
Plaintiffs rely primarily on two Appellate Division cases[2] in support of the relief they request, Ansonia Assoc. v Ansonia Residents’ Assn. (78 AD2d 211), on the collection issue, and Alcoa Residences v Association of Tenants of Lincoln Towers (28 AD2d 831), on the issue of rent strike signs. The applicability or the binding effect of those decisions may not, however, be reached without consideration of the particular facts of this case, the applicability of section 230 of the Real Property Law, and the continually evolving explication of First Amendment rights by State and Federal courts, particularly several recent decisions of the United States Supreme Court. Accordingly, these three matters will be discussed prior to consideration of Ansonia and Alcoa.
FACTS
More than two years ago, at some time prior to April, 1980, a number of tenants in the hotel protested the conditions there, including numerous violations placed on it by city agencies, by joining together in an association *796 and commencing an informal rent strike.[3] That strike was settled with a stipulation which provided for certain rent abatements for the tenants and an agreement by Whitby to repair the violations.[4] Apparently, Whitby failed to live up to the stipulation, because a second rent strike followed sometime thereafter, causing Whitby to bring nonpayment actions against participating tenants. That rent strike wás “resolved” by a second stipulation made before a Housing Court Judge[5] on February 3, 1981.
THE 1981 STIPULATION
The February stipulation provided, inter alia, that the prior stipulation, including the list of violations which were to have been corrected pursuant to it, be fully incorporated. Inspections of individual apartments were to be made, and a new list of necessary repairs drawn up. The “old” repairs were to be completed within 60 days, and the “new” repairs within 90. Various promises regarding elevator service, cleaning of public areas, access to the laundry room, and the hiring of a new managing agent were made. A procedure for resolving disputes concerning the terms of the stipulation before the Housing Court Judge was also provided.
Most significant for this proceeding, the remainder of the stipulation concerned the transactions between Whitby and the Association, not the individual tenants sued. The Association was to turn over a portion of the previously withheld rent moneys it held in escrow under the 1980 stipulation and to give an accounting for funds presently held. A payment schedule was devised for those funds, conditioned on the completion of various percentages of the listed repairs. These payments were clearly to be made by the Association, on behalf of its members. An address was *797 specified for correspondence to the Association by Whitby, and Whitby agreed to pay legal fees to the attorney for the Association. Finally the stipulation provided: “It is further specifically understood and agreed, that peter schleissner and Austin colyer, members of the tenants association, agree that they are acting under a fiduciary relationship and further agrees to abide by any direction of the Court with regard to disbursement of the rent money presently being held and to be held by the tenants association or any direction given to them in writing by their attorney with regard to the disbursement of any monies being held by the tenants association, and in such event of violation of the order or of the direction of their attorney, shall subject them to immediate contempt.”
In short, although the underlying legal actions were brought against individual tenants, Whitby acknowledged and accepted the Association as their collective voice. Moreover, Whitby took advantage of the Association as both the holder and payor of previously collected rents, and the collector of future rents, in escrow, until all repairs were completed.
SUBSEQUENT PROCEEDINGS
There is no dispute that prompt and accurate accountings were given, nor that rents were paid through May, 1982.[6] Subsequently, however, the tenants and their Association began a third rent strike, this time because of conditions in the hotel resulting from a strike of the hotel’s building workers.[7]
Whitby then brought orders to show cause in Civil Court, Housing Part, against 31 individual tenants. It requested a hearing pursuant to paragraph 14 of the 1981 stipulation, judgments of possession and rent arrears against each of the tenant respondents, and/or payment of all rent arrearages into Civil Court “pending resolution of its disputes under the stipulation”. On June 25, the Hous *798 ing Court Judge denied Whitby’s applications in their entirety.[8]
THE INSTANT PROCEEDING
On July 30, Whitby commenced the instant proceeding by service of a summons and complaint for permanent injunction and punitive damages. Simultaneously it brought an order to show cause why a preliminary injunction should not issue which brought on the instant motion. That order contained a temporary restraining order which was signed by Justice Riccobono on August 2. The temporary restraining order enjoined the Association from continuing solicitation and collection of rents from individual tenants, and from releasing any rent moneys already on deposit except pursuant to a court order. On the return date, upon oral application, the stay was continued until determination of this motion, but an oral application for a similar stay of the exhibition of rent strike signs was denied. Of course, in determining this motion, this court is not bound by any of the prior temporary restraining orders or stays (see Ansonia Assoc. v Ansonia Residents’ Assn., 78 AD2d 211, 213, supra). For the reasons below, I dissolve that stay and deny that portion of Whitby’s motion for preliminary injunction of collection of rents by the Association.
THE NECESSITY FOR A PRELIMINARY INJUNCTION
It is well settled that a court may not grant a preliminary injunction except upon proof of three essential elements: (1) likelihood of ultimate success on the merits; (2) irreparable injury absent granting the preliminary injunction; and (3) a balancing of the equities. (Albini v Solork Assoc., 37 AD2d 835 [citations omitted], cited with approval in Paine & Chriscott v Blair House Assoc., 70 AD2d 571, 572; Chrysler Corp. v Fedders Corp., 63 AD2d 567, 569.) Since it is an extraordinary remedy it should be granted only with great caution and is inappropriate unless a clear right to such relief is shown. (Chrysler Corp. v Fedders Corp., supra, p 568.) Where the ultimate relief *799 requested is a permanent injunction, the tests are even more strictly applied, and the remedy more disfavored, since the granting of temporary relief in essence decides the lawsuit (see, e.g., Rosen Monuments v Madonick Monuments, 62 AD2d 1053; Rohauer v Killiam, 37 AD2d 547).
In applying the first portion of the test, that of likelihood of success, this court must consider the statutory scheme, prior decisions of higher State courts, and the requirements of the First Amendment. For clarity, although the collection and rent strike sign issues are clearly related for statutory and constitutional purposes, each will be discussed in turn.
I. COLLECTION OF RENT BY THE ASSOCIATION
a. Constitutional and Statutory Framework
According to the president of the Association, “The Tenant Association is a member organization, only of tenants in the building, and is acting for them as a collective body politic.”
The right of such association is basic to our constitutional scheme (see, e.g., N.A.A.C.P. v Alabama, 357 US 449), and has been strongly reiterated in two recent decisions of the United States Supreme Court. In Citizens Against Rent Control v Berkeley (454 US 290, 294) the court wrote, “the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process * * * by collective effort individuals can make their views known, when, individually, their voices would be faint or lost.” (See, also, N.A.A.C.P. v Claiborne Hardware Co.,_US_,_, 102 S Ct 3409, 3423.)
In accordance with this historic protection, our Legislature has specifically recognized the right of tenants to join together in order to redress the imbalance of power in the individual landlord/tenant relationship, as well as to enforce those laws and regulations by which the State and city seek to compel minimum standards of health, safety and habitability in multiple dwellings.[9]
*800 Section 230 of the Real Property Law, enacted in 1975, reads as follows:
“Right of tenants to form, join or participate in tenants’ groups
“1. No landlord shall interfere with the right of a tenant to form, join or participate in the lawful activities of any group, committee or other organization formed to protect the rights of tenants; nor shall any landlord harass, punish, penalize, diminish, or withhold any right, benefit or privilege of a tenant under his tenancy for exercising such right.
“2. Tenants’ groups, committees or other tenants’ organizations shall have the right to meet in any location on the premises which is devoted to the common use of all tenants in a peaceful manner, at reasonable hours and without obstructing access to the premises or facilities. No landlord shall deny such right.”
The Legislature has also created a statutory warranty of habitability (see Real Property Law, § 235-b), whose purpose is to place individual tenants on a more equal legal footing in the landlord/tenant relationship. (See Park West Mgt. Corp. v Mitchell, 47 NY2d 316.) To effectuate their statutory right to safe and decent housing, individual tenants may withhold their rent and interpose violations of the warranty of habitability as defenses in summary dispossess proceedings brought by the landlord.
Where a landlord’s failure to comply with the Multiple Dwelling Law or local building codes or to make necessary repairs goes beyond an individual tenant and her or his apartment, the purpose of section 235-b of the Real Property Law is best served by all the affected tenants joining together and jointly exercising this right to withhold rent. In this fashion, the “effective advocacy” of their views, rights and grievances is undeniably enhanced (N.A.A.C.P. v Alabama, 337 US 449, 460, supra). This is precisely the function of tenant associations, and the close *801 connection between section 230 and the First Amendment has been noted by appellate courts in this State (see Grayson v Christian, 64 AD2d 887, 888).
The Association in this case is doing no more than its individual members have an absolute statutory right to do individually. Its action in holding the moneys representing withheld rent payments of its members is entirely legal and proper. As the president of the Association states, “Monies that had been given to the Tenant Association by various tenants are returned to the tenants on their mere request, due to the fact that those monies belong to the tenants until such time as [Whitby] provides a lawful claim for them.” He goes on to note that there is “no difference between the function performed by the Tenant Association and the collective depositing of monies by all the tenants under separate signatures.”
Since this is true of the holding of the withheld money, it is also true of the collection of that money, at the request and volition of individual tenants. All that remains is the question of solicitation of additional members, and thus of additional rents withheld. Here the First Amendment and section 230 of the Real Property Law, taken together, seem dispositive.
Tenant organizations are formed and exist by virtue of the solicitation of individual tenants to join to make their views known, and to jointly protest unlawful conditions by such lawful actions as withholding rent. A major service provided by tenant associations to their members is the safe holding of rent over a period of time so that those moneys (or a portion of them) will be available when a settlement is reached or a court enters judgment.[10] To organize a lawful and legally protected tenant association thus often requires, of necessity, that tenants be solicited to withhold jointly, deposit and hold their rent, as is their *802 individual right. The tenant association is not taking the landlord’s money or wrongfully expropriating rents due him for some other purpose, it is simply acting as the “collective body politic” in the exercise of its members’ 235-b rights. Further, to deny tenants’ associations the right to solicit members for this lawful activity would be tantamount to constraining their formation and undermining their existence; this would be in clear derogation of the Legislature’s intent in enacting section 230 of the Real Property Law.
Were this discussion one of first impression, clearly the matter would be resolved in favor of the Association. There is, however, the Appellate Division’s decision in Ansonia which Whitby argues requires a contrary determination. A close reading of that decision, however, fails to support Whitby’s position.
THE ANSONIA DECISION
As Justice Sandler’s separate opinion noted, “the injunction [against further collection of rents by the tenant association] reflects a response to what is perceived to be a particular problem presented by peculiar aspects of this lawsuit and is not intended as a general disapproval of an obviously desirable procedure.”[11] (Ansonia Assoc. v Ansonia Residents’ Assn., 78 AD2d 211, 223, supra [concurring and dissenting opn].)
Because the facts oí Ansonia are entirely distinguishable from those in the instant case, the continued solicitation and collection of rents by the Association should here be “approved,” rather than enjoined, as in Ansonia. Three differences, each critical to the Ansonia holding, are particularly notable.[12]
*803 The court in Ansonia found that the landlord had clearly established a prima facie right to the rents withheld. Although this right was subject to the tenants’ defenses, the court considered those defenses to be weak, at best.[13] Whitby’s position here is far less compelling.[14] Moreover, the landlord in Ansonia factually demonstrated irreparable injury from the continued withholding of rents; here, there are merely allegations, and the underlying factual situation is far different.[15]
Most important, however, is the procedural posture. The landlord in Ansonia brought its sole action in Supreme Court. The tenants argued that a preliminary injunction was inappropriate because there was an adequate remedy at law in the Civil Court. The majority opinion found, however, that the necessity of the landlord instituting 300 to 350 nonpayment cases in Civil Court did not constitute an appropriate remedy “in the face of the well-settled rule that where an action is brought in Supreme Court seeking equitable relief, the case will not be dismissed if legal relief is available” (Ansonia Assoc. v Ansonia Residents’ Assn., 78 AD2d 211, 215-216, supra).
Here, of course, the landlord has already twice selected Civil Court as the forum for trying its claims for rent and possession and has already commenced summary proceedings there. Thus there is no showing that Whitby would be unduly and unfairly burdened by doing what it has already done, i.e., seeking its adequate legal remedy in the Civil Court.
*804 Further, Whitby does not here seek current rent or a turnover of past rent as in Ansonia, or ejectment of the individual tenants; this was the subject of its Civil Court order to show cause. If the relief sought here were granted, Whitby would be in precisely the same situation vis-á-vis the rents it concedes the tenants may withhold as it is now — that is, it would not have them.
Finally, the relationship between Whitby and the Association is, because of prior litigation history, entirely different than that in Ansonia. Whitby has recognized the Association, entered into court-approved stipulations with it, accepted the Association’s services in collecting and paying over rent, and even paid its attorneys’ fees! These facts not only distinguish the instant case from Ansonia but also raise a serious issue of estoppel.
Although the majority opinion in Ansonia seems somewhat internally inconsistent, as the dissenting opinion points out, and although the Appellate Division appears not to have had the benefit of a full explication of the statutory and constitutional issues,[16] this court would, of course, be bound to follow it in a similar case. Since, however, the instant case is completely distinguishable, Ansonia is not controlling and will be deemed confined to its facts.
Accordingly, I find that Whitby has failed to show a probability of success on the merits. Similarly it has completely failed to demonstrate any irreparable injury resulting from denial of the preliminary injunction. Finally, because of the burden on First Amendment rights of association which would result from an injunction, and the undermining of tenants’ ability to organize effectively as recognized and protected by the Legislature, I find that the equities favor the Association. For these reasons, that portion of Whitby’s motion which seeks to enjoin the solicitation or collection of rents by the Association on behalf of its members is denied.
*805 II. THE RENT STRIKE SIGNS
As part of their associational activity, and in order to bring their grievances against Whitby to the attention of the public, the tenants have displayed signs in the windows and on the doors of their apartments, and have hung one or more bed sheets with the words “Rent Strike” from their windows so that they cover some portion of the hotel’s facade. Tenants argue that their activities constitute speech which is protected by the First Amendment. Whitby relies on one Appellate Division case, Alcoa, and several lower court cases in urging an injunction against this activity.
This case thus requires the court to engage in a sensitive balancing of First Amendment and property interests. Additionally, because it would result in a prior restraint on speech, the cases cited must be read with great care, and in the light of subsequent decisions of the United States Supreme Court which cast some doubt on their continued vitality.
In analyzing those Supreme Court decisions, two main issues appear. These are the questions of limited or diminished protection for “economically coercive” speech, and the accommodation which must be made between speech and private property rights. Those issues will be discussed, seriatim, after a brief summary of the special considerations which apply to prior restraint.
PRIOR RESTRAINT
There can be no question that the behavior sought to be enjoined is communicative activity in one of its purest forms. An injunction would deny tenants their right to exercise this communication, thus constituting a “prior restraint” on such speech.[17] (See Segal v Wood, 42 AD2d 548.) “[0]ne seeking such relief bears a ‘heavy burden of showing justification for the imposition of such a restraint.’ ” (Reliance Ins. Co. v Barron’s, 428 F Supp 200, *806 204, citing Organization For Better Austin v Keefe, 402 US 415, 419.) The Supreme Court has explained the rationale for this especially heavy burden as follows:
“[Pjrior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights * * *
“A prior restraint * * * has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication ‘chills’ speech, prior restraint ‘freezes’ it at least for the time.
“The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events.” (Nebraska Press Assn. v Stuart, 427 US 539, 559.)
Beside the spirit of the First Amendment, public policy requires that prior restraint be avoided whenever possible, and then employed only upon a showing of truly irreparable and uncompensable injury. (Reliance Ins. Co. v Barron’s, supra, p 205.) This has been the law in this State since 1839, long before the enactment of the Fourteenth Amendment, when Chancellor Walworth refused to enjoin publication of a libel, writing that such power “cannot safely be entrusted to any tribunal consistently with the principles of a free government” (Brandreth v Lance, 8 Paige Ch 24, 26).
COERCIVE EFFECT
Whitby cites a number of cases[18] for the proposition that otherwise protected speech may be enjoined where its intent is to “economically coerce [the moving party] into meeting * * * demands” (Roosevelt Hosp. v Orlansky, 92 Misc 2d 525, 526). The leading case representing this position, cited in virtually all of the others, is Springfield, Bayside Corp. v Hochman (44 Misc 2d 882). There, tenants picketed their landlord’s building because of various claimed grievances. The court, after assuming the pickets to be both true and peaceful, characterized the tenants’ activity as “[ujnilateral, coercive action, calculated and *807 likely to inflict [extremely severe] economic damage” and granted preliminary injunctive relief to “avoid the infliction of irreparable injury upon the plaintiff prior to the determination of this action on the merits” {supra, p 886).
It is noteworthy that neither Springfield nor any of its progeny discuss or apply the special constitutional dimensions of prior restraint, nor does there appear to be any “irreparable injury” found, or even alleged, other than the possibility of some lost business. A long series of United States Supreme Court cases culminating in N.A.A.C.P. v Claiborne Hardware (_ US _, supra) demonstrates conclusively that neither this kind of injury, nor the “economically coercive intent” of a speaker justify or permit prior restraint of her or his speech.
First, as Claiborne and Organization For Better Austin v Keefe (402 US 415, supra) teach, the content and purpose of the speech must be examined. As in both of those cases, the tenants here do not simply have a private economic grievance against their landlord. In fact, the economic aspect — i.e., withholding rent — arises precisely as a statutorily created remedy for the enforcement of rights to decent living conditions granted by law. In other words, by displaying signs which tell the public the tenants are on a rent strike, the tenants seek to embarrass and even to coerce the landlord economically into according them their rights under the Multiple Dwelling Law, the Administrative Code of the City of New York, and section 235-b of the Real Property Law.
In Organization For Better Austin the petitioner, a racially integrated community organization, charged that the respondent real estate broker had engaged in “blockbusting”. Petitioner unsuccessfully sought to have respondent sign an agreement not to solicit property in its community, and followed this by distributing leaflets which were critical of his business practices, near his home. A State court enjoined the leafletting. The Supreme Court wrote that the lower courts were “apparently of the view that petitioners’ purpose in distributing their literature was not to inform the public, but to ‘force’ respondent to sign a no-solicitation agreement. The claim that the expressions were intended to exercise a coercive impact on *808 respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondents’ conduct by their activities; this is not fundamentally different from the function of a newspaper. See Schneider v. State, supra; Thornhill v. Alabama, 310 U.S. 88 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent’s real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability.” (Organization For Better Austin v Keefe, 402 US 415, 419, supra.) The court then dissolved the prior restraint, holding that “offensive” and “coercive” speech was nevertheless protected by the First Amendment.
In Claiborne, the local chapter of the NAACP demanded action from the city officials of Hattiesburg, Mississippi, to end racial discrimination, threatening a boycott of white merchants. When their demands were not met, the boycott began. In striking down a judgment against the NAACP under Mississippi law, the Supreme Court first noted the associational character of the boycott which brought it within the protection of the First Amendment.[19] The court then observed as follows (_US _, _, 102 S Ct 3409, 3424): “Speech itself also was used to further the aims of the boycott. Nonparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation. These elements of the boycott involve speech in its most direct form. In addition, names of boycott violators were read aloud at meetings at the First Baptist Church and published in a local black newspaper. Petitioners admittedly sought to persuade others to join the boycott through social pressure and the ‘threat’ of social ostracism. Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action.” The boycott was successful, at least to the extent of substantially reducing the business of the white merchants — i.e., causing direct *809 economic harm to persons other than those from whom action was directly demanded. Nevertheless, and in a situation where prior restraint was not involved, the Supreme Court held that boycott activity protected, citing, inter alia, Organization For Better Austin v Keefe (402 US 415, supra).
These cases clearly demonstrate that the right to air grievances and to demand that legally created rights be accorded is protected notwithstanding its economically coercive effect or the actual economic injury it causes. Accordingly, the cases cited by Whitby on this issue may not be followed, consistent with the requirements of the Constitution. (See Segal v Wood, 42 AD2d 548, supra; Plainview Realty v Board of Managers of Vil. on Artist Lake Condominium, 86 Misc 2d 515 [both citing Organization For Better Austin].)[20]
PROPERTY RIGHTS
In 1967, in a three paragraph Per Curiam opinion, the Appellate Division upheld a preliminary injunction which prevented residents of Lincoln Towers “from displaying aluminum foil or other material from the windows of [their] apartments” (Alcoa Residences v Association of Tenants of Lincoln Towers, 28 AD2d 831, supra). The court’s entire rationale was as follows: “The outside of the building was not rented to the tenants, and their action in displaying material from the windows was in effect a trespass upon a portion of the building reserved to the plaintiff.” (Supra, p 831.) A distinction was made there between picketing or handbilling, which generally occur on public property, and the display of signs — or other communicative material — which the court saw as infringing the property rights of the building owner. (Accord Park Towers South v Solay, NYLJ, Aug. 28, 1980, p 6, col 2, supra.)
*810 The balancing of First Amendment rights against those of private property has undergone a significant metamorphosis since A Icoa was decided. An examination of Federal constitutional decisions since 1967 reveals two significant trends.
First, the rights of an owner to private property are weighed against those of a speaker’s need to employ the property to communicate certain information. Those property rights may, in certain circumstances, be outweighed. Second, because of legislative or other State action, property itself may be redefined or limited to allow greater expression of ideas.
The first trend emerges from leafletting cases involving quasi-public facilities (see, e.g., Wolin v Port of N. Y. Auth., 268 F Supp 855, affd 392 F2d 83, cert den 393 US 940). The court distinguished private property from that of the Port Authority, writing that, “[i]f it were private property, used for the owner’s private purposes, plaintiff’s Constitutional right to disseminate ideas and to communicate beliefs and views would be required to yield to the owner’s right to be protected against trespass or invasion of his Constitutional right of privacy” (268 F Supp 855, 859, supra; emphasis added).
Already, deference to private property rights included a requirement that an owner’s interest must be a real one, not simply the existence of a relation of ownership to the property. But this diminution of property rights qua property rights reached for fuller expression in cases involving privately owned migrant worker camps. Where individuals or organizations sought access to such camps to disseminate information to their inhabitants, the owner’s rights to be free from what otherwise was clearly a trespass were frequently overridden in favor of First Amendment interests.[21]
*811 For example, in permitting access to representatives of a legal services organization which sought to inform migrants of their legal rights, the Southern District held “Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by those who use it” (Mid Hudson Legal Servs. v G & U, Inc., 437 F Supp 60, 62; see, also, Franceschina v Morgan, 346 F Supp 833; Illinois Migrant Council v Campbell Soup Co., 519 F2d 391).
The result of these and similar decisions signals the emergence of a delicate balancing in which the questions of whether and how, or for what purposes, an owner uses its property become significant factors in a case-by-case analysis (cf. Lloyd Corp. v Tanner, 407 US 551, 567).
Here three separate elements of Whitby’s “property” are involved. They are the windows of tenants’ apartments, the outside doors to those apartments, which open into common areas used by all tenants, and the exterior facade of the building. There is, and presumably can be, no showing that Whitby uses the first two for any purpose of its own; both are, within general understanding of tenancy, for the tenant’s use. The building facade presents a slightly, but not substantially, different matter. Landlords generally do not “use” their facades except where portions of building exteriors are rented for commercial advertising. In that case, which of course, is not present here, the landlord could show that its “use for its own private purposes” was being infringed, defeating the First Amendment claim of a tenant who covered that commercial message with a bed sheet conveying a different message.
Where, however, as here, the areas in which the owner asserts his rights are, for all practical purposes, “public”, the result should be in favor of the First Amendment. For it is clear that Whitby’s real objection here is not that its property is being used — presumably displaying geraniums or tapestries would evoke no protest — but that the content of the speech for which it is being used is not *812 acceptable. The First Amendment should not be required to bow to such assertion of property “rights”.
A second line of cases demonstrates that property and property rights are not monolithic concepts, and that the State may, in the appropriate exercise of its power, circumscribe those rights to further another interest. The most common examples involve the exercise of State police power in, for example, zoning regulations (see, e.g., Agins v City of Tiburon, 447 US 255) or Congress’ exercise of its commerce clause power through, for example, antidiscrimination laws (see, e.g., Atlanta Motel v United States, 379 US 241).
The Supreme Court has held recently that the State may act to restrict or limit private property rights in furtherance of the exercise of First Amendment rights by its citizens, and that such limitation does not constitute an unconstitutional taking. (PruneYard Shopping Center v Robins, 447 US 74.) In that case, the California Supreme Court interpreted its State Constitution to permit citizens to exercise free expression and petitioning rights in a private shopping center. The United States Supreme Court rejected the shopping center’s argument that this amounted to an unconstitutional infringement of its property rights under the taking clause. It held that, under the circumstances, “the fact that [the petitioners] may have ‘physically invaded’ [the center’s] property cannot be viewed as determinative” (PruneYard Shopping Center v Robins, supra, p 84).
Under PruneYard, the courts of this State could presumably make a determination similar to that of the California Supreme Court (23 Cal 3d 899, 910) in interpreting our Constitution[22] to permit the tenants’ actions here. The holding of PruneYard, however, also suggests another way of looking at the First Amendment balancing required in this case.
The owner here, Whitby, is not a private person in a private home, nor the proprietor of a small retail establishment. Whitby is engaged in the business of rental housing, an industry which, as previously discussed, is regulated *813 heavily by the State and city through the exercise of their police powers. One who chooses to engage in this business takes “property”, the rights to which are already circumscribed by building codes and regulations. In addition to those laws and regulations, indeed in support of them, the Legislature has expressed another policy of limitation on the landlord’s “bundle of property rights” — that contained in section 230 of the Real Property Law.
Somewhat like the judicial action in PruneYard, the Legislature has specifically taken from the landlord its right to control common areas of his property to the exclusion of its tenants’ First Amendment rights of association. While section 230 does not cover the precise means of speech employed by the tenants and their association here, it expresses a clear State policy that the associational rights of tenants — whether derived from the First Amendment, or pursuant to State legislation shall not be curtailed solely because the property where they live, meet and wish to communicate with each other and the world at large is privately owned. This State policy may and must be considered in the balancing of the tenants’ rights of speech and association against Whitby’s “property rights”.
In summary, the tenants seek to engage in a virtually pure form of speech. They do so to inform other tenants of the existence of a rent strike (association) and to communicate to the world at large the deprivation of their right to decent housing conditions, all in an effort to compel Whitby to accord them those rights. Whitby seeks to restrain them from such speech on parts of its property which it does not “use” privately, and which, in fact, are used by, and intended to be used by the tenants (doors and windows) or are “public”, and not “used” at all (the facade). Under these circumstances, except for the limitation discussed below, the balance must tip to the First Amendment.
CONCLUSION
Were this court writing on a clean slate it would deny Whitby’s motion in its entirety. Because of the very substantial changes in First Amendment law since 1967, and the enactment of section 230 of the Real Property Law in 1975, the Appellate Division’s decision in Alcoa may no longer be binding. However, to the extent that that deci *814 sion. specifically proscribes draping or hanging signs or banners out of windows over the building’s facade, I must respectfully but regretfully follow it. The Appellate Division is, of course, free to hold otherwise, and it is hoped that the analysis contained in this opinion will aid it in doing so. Since Alcoa contains no clear holding regarding signs in the windows, or on tenants’ apartment doors, however, display of signs in those places will not be enjoined.
The rights of association and speech mean little if they do not include protection of effective association and meaningful speech. Solicitation, joint withholding of rent, and communication of grievances to the outside world are among the most important means available to tenant associations toward the end of decent housing for our citizenry. Given legislative recognition of the need for such associations, and the protections of the First Amendment for association and speech, those means should not lightly be curtailed.

. In the caption of its pleadings, Whitby sues three persons “individually and as officers of Whitby Tenants Association” and those three tenants together with five others “individually and as representatives of a class of tenants and residents of the WThitby Hotel”. As no class action determination has been requested or made, it is unclear precisely who would be bound by an injunction other than the named tenants. For purposes of this opinion, however, all members of the Association will be considered.

. As discussed below, Whitby cites other cases, but these are either unreasoned Per Curiams in the Appellate Division, or decisions of courts of co-ordinate jurisdiction which, while entitled to respect, are not binding here. It should be noted that the Second Department has allowed Ansonia Assoc. v Ansonia Residents’ Assn. (78 AD2d 211) in Fairfield Presidential Assoc. v Pollins (85 AD2d 653), but the opinion there simply cites Ansonia and recites that there will be irreparable injury. Accordingly, it will not be considered separately.

. It is conceded that none of the rent strikes discussed here were conducted under the statutory requirements of KPAPL article 7-A which involve the deposit of rent moneys into the court. They were, instead, the more common and more informal individual and associational withholding of rent while violations continued.

. No copy of that stipulation has been produced by either side, so it is unclear who signed it, what the repair schedule was, etc.

. The stipulation of settlement occurred in Housing Court because Whitby had commenced individual summary dispossess proceedings against each of the 46 tenants who were then withholding rent.

. There was apparently one exception, Peter Schleissner, the president of the Association, who had not paid five months’ rent.

. Whitby is apparently resisting unionization of its workers resulting in a continuing labor dispute. As a consequence of the workers’ walkout, elevator service was limited or curtailed, trash piled up in the public areas and various other problems arose.

. Presumably this was because the withholding of June rent was unrelated to the terms of the prior stipulation, and the orders to show cause did not comply with the statutory requirements for bringing summary dispossess proceedings.

. It has long been clear that the existence of minimum standards, with no enforcement except by State and city officials is entirely inadequate to insure that those *800 standards are met. (See, e.g., Bar Housing Corp. v Calhoun, NYLJ, June 16, 1982, p 13, col 2.) This situation was responsible for the creation of the Housing Court (see, e.g., the legislative history of CCA, § 110, 1972, ch 982; § 1, subd [a]), the statutory warranty of habitability discussed below (see, e.g., Park West Mgt. Corp. v Mitchell, 47 NY2d 316, cert den 444 US 992) and, presumably, section 230 of the Real Property Law.

. It is common experience that tenants who individually withhold rent may well spend that withheld rent for other necessities during the period of their dispute with their landlord. When a determination of how much rent is actually due is finally made, they may no longer have the resources or ability to meet the judgment or stipulation and may thus face eviction. The knowledge that an association will hold that rent for them, as well as the “safety in numbers” of knowing that their fellow tenants are similarly involved provide a strong impetus for joining a tenant association.

. The majority opinion recognized that the landlord’s interest might be best served by denying the injunction and allowing the tenant association to continue collecting rent so as to insure “ ‘that the rent money [would] in fact be available if and when the landlord ultimately recovered] a judgment’” (78 AD2d 211, 220, supra).

. There are numerous other distinctions, including the facts that in Ansonia, unlike here, the deterioration of services and accumulation of violations had occurred under á prior owner, the underlying action was to obtain a turnover of rents already collected by the Association and, as the court wrote {supra, p 213), “[TJhere was plainly no identity *803 between the association and its memberfs]”. None of these facts are present in the instant case.

. The new landlord had already spent $1.7 million in improvements, and the Conciliation and Appeals Board had granted reinstatement of rent guidelines after inspection of the premises.

. Whitby has a history of violations and noncompliance with stipulations. The tenants have submitted evidence of conditions resulting from the building workers’ strike which is remarkably similar to those found in Park West Mgt. Corp. v Mitchell (47 NY2d 316, supra), and there is a prior history of rent abatements.

. The Association here represents 50 tenants out of more than 200. In Ansonia, 300 tenants were involved. The landlord’s huge expenditures, for renovation placed it in a far more vulnerable financial situation from the loss of so much greater a percentage of its rent roll.

. Section 230 of the Real Property Law was mentioned in passing, but the First Amendment right of association was not; it is their interface which militates against enjoining a tenant association from collecting rent under these circumstances.

. This is in contradistinction to the majority of First Amendment cases where the State attempts to punish speech after it has occurred. Prior restraint cases generally arise either in the context of the press (see, e.g., Near v Minnesota, 283 US 697) or in licensing and permit schemes for speech in public places (see, e.g., Lovell v Griffin, 303 US 444; Cox v New Hampshire, 312 US 569).

. See, e.g., Saxon Motor Sales v Torino, 166 Misc 863; Westwillow Realty Corp. v Taylor, 23 Misc 2d 867; Park Towers South Co. v Solay, NYLJ, Aug. 28, 1980, p 6, col 2, and cases discussed below.

. The court wrote (supra, p_, 3424): “Of course, the petitioners in this case did more than assemble peaceably and discuss among themselves their grievances against governmental and business policy. Other elements of the boycott, however, also involved activities ordinarily safeguarded by the First Amendment.”

. Both these cases uphold picketing whose intent was to boycott or otherwise economically coerce plaintiffs who had direct connection with the premises out of which the picketers’ grievances arose. Segal upheld that portion of the injunction against picketing unrelated persons with businesses in the area. While this related/unrelated distinction is not involved here, Claiborne appears to have somewhat modified it, depending on the speech and the circumstances.

. It is important to note that these cases are generally not decided, or not decided solely on the basis of the “company town” rationale of Marsh v Alabama (326 US 501). The Marsh test is one which is employed to overcome the State action hurdle in cases where access is denied privately and the judicial system is asked to intervene. Where trespass actions or criminal charges are brought, or where as here, the private owner *811 asks the State to act, the problem of State action is substantially diminished. The distinction between the Marsh rationale and the balancing of First Amendment and property rights is thoughtfully explicated in Asociacion de Trabajadores Agricolas de Puerto Rico v Green Grant Co. (518 F2d 130, 136-137).

. Section 8 of article I of the New York State Constitution provides “[e]very citizen may freely speak, write and publish his sentiments on all subjects”.